[No. 26728. Department Two. January 4, 1938.]
ELEANOR KNOPP et al., *Appellants*, v. KEMP & HEBERT, *Respondent*.[1]

*Dillard & Powell,* for appellants.
*Post, Russell, Davis & Paine,* for respondent.

ROBINSON, J.—The respondent, Kemp & Hebert, a corporation, has for many years operated a department store in Spokane, known as the Palace, occupying and controlling the entire building situated at the northeast corner of Post street and Main avenue. The entrance door of the store on the Main avenue side is set back from the sidewalk about fifteen feet, and the strip of floor between the front wall of the store and the sidewalk is used as an arcade for the display of goods in glass enclosed areas, so arranged as to leave

[1]Reported in 74 P. (2d) 924.

three open passages for entrance to the arcade area and the entrance door. The floor of the arcade is terraza, a composition mainly of cement and marble chips. It slopes slightly from the entrance door to the sidewalk, but so slightly that we think that fact of little or no importance. The sidewalk in front of the store is of the ordinary, familiar cement mixture. Along the inside of the sidewalk where it joins the terraza, rows of small blocks of glass about two inches square are set in the cement, a type of construction with which everyone is familiar.

On the afternoon of February 18, 1936, as the evidence shows, Eleanor Knopp, a woman then sixty-nine years of age, had been at the Kress store, just east of the Palace, with her sister and another woman. They left there to go to the Palace. It had been snowing and, perhaps, thawing. At any event, there is evidence that the sidewalk in front of the store was wet and some of the slush or water had slopped over on the terraza floor where it joined the cement sidewalk. As Mrs. Knopp stepped on the terraza, she slipped and fell on her right side, seriously injuring her upper right arm and her right shoulder.

It is alleged that the terraza floor is very smooth and becomes exceedingly slippery when wet, is dark in color, and, when wet and tracked over by people entering the store, becomes so similar in appearance to the cement sidewalk that the ordinary person entering the arcade would not observe that he was passing from one type of floor to another, and for this reason the place presented a pitfall or trap to persons using the entrance in the manner for which it was designed and intended.

Mrs. Knopp testified that she was wearing rubber galoshes at the time; that the muddy water from the sidewalk had been tracked in toward the door so that

the cement of the sidewalk and the terraza looked all the same color. She had often been in and out of the Palace and was familiar with the general layout of the arcade and entrances, although she could not say whether or not she ever before passed over the exact areas where she fell.

Mr. Rasque, an architect who has supervised the construction of many public buildings, perhaps a hundred or· more, including most of the state buildings in eastern Washington, testified that he had examined the floor where the accident happened and several other floors, and this was more slippery than any of the others. That portion of his evidence which is chiefly relied upon is as follows:

"That floor in there is made of terraza. It is called a terraza floor, and is made up of Portland cement and marble chips, but has an exceedingly smooth surface.

"This floor has an exceptionally smooth surface and would be suitable for inside floors, I would say, in my opinion it is too smooth a surface to be used for ramps or too smooth to be used for ramps or outside terraza work. According to good practice for designing or constructing all terraza floors for exterior, we add an anti-slip mixture to the terraza. And for floors of this type it required an added mixture of this anti-slip material or abrasive such as carborundum or alundum in the proportions of about two hundred pounds of this material to three hundred pounds of marble chips."

Mr. Rasque further testified that he examined the floor by looking at it, feeling of it, and rubbing his feet over it, but that he had made no analysis to determine the proportion of abrasive material in its construction; that the adjoining sidewalk was of a float finish cement, not very slippery, and that, although the glass insets would be slippery when wet, the intervening strips of cement between the glass blocks would tend to prevent slipping.

When the plaintiff rested, the defendant moved for a directed verdict or, in the alternative, for nonsuit. A directed verdict was returned, and from the judgment entered thereon this appeal was taken.

The law requires a storekeeper to maintain his storeroom and the entrances thereto in such a condition as a reasonably careful and prudent storekeeper would deem sufficient to protect customers from danger while exercising ordinary care for their own safety. *Tyler v. Woolworth Co.,* 181 Wash. 125, 41 P. (2d) 1093.

The testimony of Mr. Rasque, to the effect that this floor, though suitable for an inside floor, was "too smooth" for outside use, is a mere expression of personal opinion and furnishes no fact or data which would enable the jury to find that the floor was so smooth as to be actually dangerous, or that its maintenance constituted negligence. In fact, one cannot even be sure from Mr. Rasque's evidence that he considered it so, although he unquestionably made it plain that he thought it would have been safer had it contained a greater proportion of abrasive material.

The decisions of this court, as well as the decisions of other courts, have very generally denied recovery in cases where persons have fallen on smooth floors, even when they are made slippery by the presence of wax or water. A great many of these cases are collected and discussed in *Shumaker v. Charada Inv. Co.,* 183 Wash. 521, 49 P. (2d) 44. Among the cases there cited is *Kresge Co. v. Fader,* 116 Ohio St. 718, 158 N. E. 174, 58 A. L. R. 132, from which we quote as follows:

"It is a fact known to all that many stores in all branches of trade have an inside door or passageway into the store, usually in the middle of the front. On each side of this passageway is a display window. The passage then extends back ten or twelve feet or more to the entrance door to the store. This passage usually

has a slight slope from the door to the sidewalk, at which line there is no door. This slope is to carry away the rain that may blow into the passageway. The passageway is in fact practically a part of the sidewalk, but at the same time it is within the front line of the store, and under control of the store. Would any one contend that, if a person walked into such passageway when it was raining, and there slipped and fell, he could recover damages because there was moisture on the floor of the passageway? Manifestly not. Everybody knows that, when people are entering any building when it is raining, they will carry some moisture on their feet, which will render the floor near the door on the inside damp to some extent, and every one knows that a damp floor is likely to be a little more slippery than a dry floor. In this instance Mrs. Fader knew that her own shoes were wet when she went in there out of the rainstorm, and after walking on the wet sidewalk. Two of her companions who preceded her crossed the same wet spot as she did, and did not fall, and the one of them who testified in the case said that he did not turn and warn her about the wet spot, as there was nothing about it to indicate to him that it presented any danger — a very frank and a very natural statement."

See, also, *Cornwell v. S. S. Kresge Co.*, 112 W. Va. 237, 164 S. E. 156; *Picman v. Higbee Co.*, 54 Ohio App. 55, 6 N. E. (2d) 21; *Anderson v. Seattle Park Co.*, 79 Wash. 575, 140 Pac. 698; *Mullen v. Sensenbrenner Mercantile Co.*, 260 S. W. (Mo.) 982.

Walking, although it becomes automatic by long practice and use, is, after all, a highly complicated process. The body balance is maintained by the co-ordination of many muscles, and their operation is controlled by an intricate system of motor nerves, the failure of any of which for a split second, on account of advancing age or for some other reason, may cause a fall. It is common knowledge that people fall on the best of sidewalks and floors. A fall, therefore, does

not, of itself, tend to prove that the surface over which one is walking is dangerously unfit for the purpose.

Appellant contends, however, that cases of the type hereinbefore cited do not fully cover the circumstances in the case at bar. It is argued that the situation presented a trap for the unwary, since the terraza surface was more slippery than the adjoining sidewalk, and the junction of the two surfaces was obscured by slush or muddy water so that one entering the store could not determine where the sidewalk ended and the terraza began. But it would seem that one entering the store could not help but see the broad terraza surface of the arcade and would naturally conclude that it extended to the sidewalk line. At all events, the appellant would naturally proceed very carefully in passing over the wet, glass-studded sidewalk. She testified that she did so, and what further precaution could or would she have taken had she noted the exact line of demarcation between the sidewalk and the terraza? We see nothing in the circumstances of the case to bring it within the rule of such cases as *Short v. Spokane,* 41 Wash. 257, 83 Pac. 183, and *Tyler v. Woolworth Co., supra.*

We think there was no substantial evidence submitted on behalf of the appellant that the respondent failed to exercise reasonable care for the protection of customers invited to its store.

The judgment appealed from is affirmed.

STEINERT, C. J., BEALS, BLAKE, and SIMPSON, JJ., concur.